UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| J.R., a minor by next friend, Shawna Reed-Hayes, and SHAWNA REED-HAYES,<br>    *Plaintiffs*,<br><br>vs.<br><br>DAVID CARTER, SHAWN KOSIELAK, SHAWN ROMERIL, in their individual capacities, PAUL WHITEHEAD, in his individual capacity and as Police Chief of the Lawrence Police Dept.,<br>    *Defendants*. | )<br>)<br>)<br>)  1:11-cv-00212-JMS-DML<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Presently before the Court is Defendants' Motion for Summary Judgment, [dkt. 32], which the Court **GRANTS in part and DENIES in part** for the reasons that follow.

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible

1

evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved for the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

A movant should not argue any fact to support its motion that is contested by admissible evidence. As will be discussed below, Defendants' papers ignore the foregoing standard in advancing several of their summary judgment arguments. It is Plaintiffs' version of events that must be credited in determining whether summary judgment is proper, not Defendants' version.

The Seventh Circuit has held this to be explicitly true in the context of the Court's determination of the application of qualified immunity in an excessive force case. *Villo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008).

## II.
### BACKGROUND

Because the versions of events advanced by the parties differ in so many material respects, the Court will separate the two versions in providing the background.

### A. Plaintiffs' Version of Events

On the evening of February 14, 2009, Plaintiff Shawna Reed-Hayes called a non-emergency dispatch of the Lawrence Police Department ("LPD") when Plaintiff J.R., her thirteen-year-old son, did not return home before his curfew. [Dkt. 43 at 7.] When Ms. Reed-Hayes agreed to file a missing person's report, the dispatcher sent Defendant Officer David Carter to her home. [*Id*.]

J.R. returned home after Officer Carter left, and Ms. Reed-Hayes called Officer Carter back to the house to speak with J.R. [*Id*.] After Officer Carter left for a second time, J.R. and his brother Cedric "became involved in an altercation as a result of Cedric's attempts to admonish J.R. about respecting his mother." [*Id*.]

Ms. Reed-Hayes called the police again at Cedric's urging. [*Id*.] When Officer Carter returned to the home, Cedric had J.R. in a "bear hug" upstairs, and it did not appear to Ms. Reed-Hayes that either boy was harming the other. [*Id*.] Officer Carter and Ms. Reed-Hayes spoke initially at the front door. [*Id*.] While Ms. Reed-Hayes was still speaking to Officer Carter, Defendant Officers Shawn Romeril and Paul Koscielak also arrived at Ms. Reed-Hayes' home and went upstairs to J.R.'s room where J.R. and Cedric were "scuffling." [*Id*.]

Ms. Reed-Hayes had previously encountered Officer Romeril at a minor traffic accident two years earlier. [*Id*. at 6.] Officer Romeril was "very arrogant, very nasty, very rude," [dkt. 45-1 at 2], to Ms. Reed-Hayes during that incident, and Ms. Reed-Hayes had written a letter to Officer Romeril's superior at LPD complaining about his behavior. [*Id*. at 6-7.]

J.R. and Cedric were both still on the floor when Officers Romeril and Koscielak entered the room. [*Id*.] The officers "snatched" J.R. off Cedric, put him against the wall, handcuffed him, and sat him on the bed. [*Id*. at 8.] While J.R. was "just sitting on the bed," the officers told him to "calm [his] little ass down" and sit on the bed. [*Id*.]

J.R. then called Officers Romeril and Koscielak "[s]eventeen-year old rent-a-cops" and said he would "kick their asses." [*Id*.] At that time, officers Romeril and Koscielak were the only ones in the room with J.R. [*Id*.]

The officers asked J.R. if he had any shoes he could put on. [*Id*.] Because J.R. was handcuffed behind his back at the time, he needed to get his hands in front of him to put on his shoes. [*Id*. at 8-9.] J.R. "kind of rock[ed]," [dkt. 45-6 at 5], on the bed to get his arms under his legs in the front. [*Id*.] Officer Koscielak said aloud that J.R. was resisting arrest, and both officers grabbed J.R. and "slammed" him to the floor between the closet and the bed. [*Id*.] Either Officer Koscielak or Romeril put his knee on the back of J.R.'s neck, and one of the officers also put his finger in J.R.'s eye, causing a blood clot in the eye. [*Id*.]

J.R. told the officers, "This shit hurts." [*Id*.] It was then that the officers began tasing J.R. [*Id*.] Cedric witnessed J.R. being tased while J.R. was on the floor beside the bed. [*Id*.] J.R. was neither resisting nor trying to get up when the officers touched the taser to his body. [*Id*.] J.R. "squirm[ed] around" while he was being tased, but he made no other movement. [*Id*.]

Officers Romeril and Koscielak were the two officers right beside J.R. while the tasing was going on. [*Id.*] Officer Carter neither tased J.R. nor played any part in handcuffing him, but he did hold back Ms. Reed-Hayes as the other officers tased J.R. [*Id.*] Ms. Reed-Hayes saw J.R. tased a total of three times by Officers Koscielak and Romeril. [Dkt. 45-4 at 4.] J.R. did not see anything that indicated Officer Carter was involved in the actual physical contact with J.R. [*Id.*]

Officer Romeril tased J.R. while Officer Koscielak pinned J.R. down. [*Id.*] The officers then put J.R. on his stomach and "hogtied," [dkt. 45-7 at 5], him by using a second set of handcuffs to secure J.R.'s cuffed hands to his belt loop behind his back. [*Id.*] There was blood on J.R.'s bed covers from the handcuffs on his wrists. [*Id.*] J.R. reported what had happened both to the medics who came to the scene and to the nurse at the juvenile detention center. [*Id.* at 10.]

Prior to the tasing incident, J.R. was an athlete who had never consumed drugs or alcohol and had never been in trouble with the police. [*Id.*] After the incident, J.R. began to have discipline problems, became chemically dependent, and was diagnosed with post-traumatic stress disorder as a result of the tasing. [*Id.*] J.R. was also diagnosed with severe depression. [*Id.*]

**B. Defendants' Version of Events**

On the evening of February 14, 2009, Plaintiff Shawna Reed-Hayes called a non-emergency dispatch of the LPD when Plaintiff J.R., her thirteen-year-old son, did not return home from school. [Dkt. 33 at 2-3.] Officer Carter visited her home twice at Ms. Reed-Hayes' request. [*Id.*] After J.R. returned home late, his brother chastised him and an altercation ensued. [*Id.* at 3.] Ms. Reed-Hayes called the LPD again, specifically requesting that Officer Carter return. [*Id.*]

When Officers Koscielak and Romeril also arrived at the home, they found Ms. Reed-Hayes at the front door talking to Officer Carter, and they heard Ms. Reed-Hayes say that her two sons were upstairs fighting. [*Id*. at 5] Ms. Reed-Hayes said that J.R. was the aggressor and was aggressive toward her. [*Id*.] Although Ms. Reed-Hayes said at first that J.R. did not hit her, she later answered the police, "Yeah, he hit me." [*Id*.]

The officers could hear commotion, yelling, and arguing upstairs, and they went upstairs to break up the fight. [*Id*.] Upstairs, the officers saw a broken glass frame in the hallway, a broken closet door, blood on the bed, and Cedric holding J.R. in a bear hug on the floor. [*Id*.] After the officers announced themselves, Cedric released J.R., and one of the officers pushed J.R. against a wall. [*Id*.] J.R. called the officers "seventeen-year-old rent-a-cops" and was defiant. [*Id*.] The officers handcuffed J.R., sat him on the bed, and told him to put on his shoes. [*Id*. at 6.]

On the bed, J.R. tried to get his handcuffs from back to front and managed to pull one leg through. [*Id*.] Officer Romeril recognized that for J.R. to have his hands in front of him "presented a more dangerous situation because an arrestee can strike or choke the officer with the handcuffs." [Dkt. 34-1 at 3.] The officers tried to take control of J.R., and Officer Romeril yelled for Officer Carter. [Dkt. 33 at 6.]

When Officer Carter entered the bedroom, he could not see J.R.'s hands. [*Id*.] Officers Romeril and Koscielak were wrestling with J.R. on the floor, and they did not have control of him. [*Id*.] Because J.R. continued to struggle with Officers Romeril and Koscielak, Officer Carter removed the cartridge from his taser, yelled "taser, taser," and tased J.R. on either his right hip or lower back. [*Id*.] Officer Carter tased J.R. in drive-stun mode for a single, five-second, standard cycle. [*Id*.] Officer Carter's taser may have contacted J.R.'s body in multiple

places because J.R. was moving around. [*Id*.] After Officer Carter tased J.R., he complied. [*Id*.] When J.R. stood up, his handcuffs were to his front. [*Id*.]

Before J.R. was tased, he was rocking and squirming around on the floor. [*Id*.] Just before being tased, he yelled, "I haven't done shit," and was trying to get away from Officer Koscielak. [*Id*.] Cedric heard the police say "stop resisting, stop resisting," and when Cedric returned to the room, he saw J.R. being tased on his right side. [*Id*.]

Officer Carter later showed the medics who were summoned to the scene where J.R. was drive-stunned with the taser. [*Id*.] The only injuries visible to J.R. were cuts or scrapes on his fingers, apparently from when he hit the closet door while fighting with his older brother. [*Id*.] J.R. had no visible injury to his wrists. [*Id*.]

The tasers possessed by the officers had the capacity to print a record of the time of day and number of times a particular taser was fired. [*Id*.] Defendants' evidence from these records is that only Officer Carter used his taser, and the use was for a single, five-second deployment. [*Id*. at 8, 11.]

## III.
### DISCUSSION

Plaintiffs have brought a seven-count complaint against the officers involved in the tasing incident, their police chief, and their department, asserting both federal and state causes of action. Ms. Reed-Hayes has sued in both her individual capacity and as J.R.'s next friend.[1] [Dkt. 1.] The officers are only sued in their individual capacities, and Chief Paul Whitehead is sued in both his individual and official capacities. Their first claim is one of excessive force against the individual officers. They also file a claim for "municipal liability," [*id*. at 5], against

---

[1] Reference to J.R. will therefore also refer to Ms. Reed-Hayes as his next friend.

7

the chief and the department. Plaintiffs have also filed state law battery,[2] and intentional infliction of emotional distress claims ("IIED") against the officers. Finally, the Plaintiffs have sued Chief Whitehead for negligent training and supervision. Defendants assert they are entitled to summary judgment on the remaining six counts.

A. Federal Claims

### 1. Individual-Capacity Excessive Force Claims Against Officers (Count I)

Plaintiffs first allege that the LPD officers used excessive force against J.R., specifically through the use of a taser. [Dkt. 43 at 14.] On motion for summary judgment, the officers argue that "[u]se of the taser to obtain J.R.'s compliance was reasonable." [Dkt. 33 at 18.]

The Court analyzes excessive force claims under the Constitution's Fourth Amendment and its reasonableness requirement. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Under this standard, the relevant inquiry is "whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them." *Id*. (internal quotations omitted).

As noted earlier, the parties here offer two very different characterizations of what unfolded inside J.R.'s home. The LPD officers maintain that J.R. was actively struggling with officers at the time the taser was used on him, [dkt. 33 at 7], and that he was tased a single time for five seconds by Officer Carter, [*id*]. In contrast, J.R. claims that he was not actively resisting when the taser was used, and that he was tased multiple times by more than one officer, [dkt. 43 at 5, 14-16].

Because the relevant inquiry here is the existence of admissible evidence to support the Plaintiffs' version of events, and because the Plaintiffs are entitled to the benefit of reasonable

---

[2] Plaintiffs have informed the Court that Ms. Reed-Hayes has elected to abandon her battery claim against Officer Carter (Count IV). [Dkt. 43 at 1.] Accordingly, the Court will grant summary judgment on that claim to Officer Carter.

inferences from the evidence, the Court finds that the Plaintiffs have presented sufficient admissible evidence to raise a question about the objective reasonableness of the force. At the very least, genuine issues of material fact exist regarding the need for and the length, degree, and nature of the force used. Therefore, the Court denies the Defendants' motion for summary judgment on the excessive force claim (Count I).[3]

### 2. Qualified Immunity Defense

In their brief, Defendants raise the affirmative defense of qualified immunity. [Dkt. 67 at 24.] The doctrine of qualified immunity protects a law enforcement officer from civil liability when that officer is performing a discretionary function and a reasonable officer would have believed that his actions were within the bounds of the law at the time he acted. *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007).

The same disputes of material fact that preclude summary judgment on the excessive force claim also preclude summary judgment on the grounds of qualified immunity. Specifically, the degree of force used against J.R. and the circumstances surrounding the exertion of force are in question, and the factual disputes surrounding those underlying issues bear directly on whether a reasonable officer would have believed the actions taken here by the LPD officers were within the bounds of the law. *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."). As stated earlier, it is the Plaintiffs' version of events the Court must credit on motion for summary judgment, and when there are disputed factual issues relevant to qualified immunity, Defendants are not entitled to a

---

[3] The Court notes that it is not finding here that Defendant's version of events would not entitle it to summary judgment. Rather, a fact issue exists as to the underlying events, such that a jury must decide whether the force used was objectively reasonable.

grant of summary judgment.[4]  *Villo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008).  Because factual issues exist as to whether the officers are entitled to qualified immunity in this instance, the Court will not grant them summary judgment on that ground.

### 3. Official-Capacity / Municipal Liability Claim (Count II)

#### a. Chief Whitehead

In their response brief, Plaintiffs inform the Court they have elected not to proceed on any official-capacity claim against Chief Whitehead.  [Dkt. 43 at 1.]  The Court therefore grants summary judgment to Chief Whitehead on Count II.  The Court understands from Plaintiffs' Complaint that Chief Whitehead is sued in his individual capacity only as to Count VII, which the Court will discuss later within this opinion.

#### b. Municipal Liability

J.R. also alleges a claim of "Municipal Liability" within Count II, for deprivations allegedly caused by "a custom, policy or practice of LPD."  [Dkt. 1 at 5.]  His official-capacity claims against Paul Whitehead as Chief of the LPD is effectively equivalent to a suit against the City of Lawrence, the municipality for which he works.  *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 690 n. 55 (1978)).  For several reasons, the claim cannot stand.

It is unclear whether the Lawrence Police Department has been named as a party, rather it appears that J.R. has sued Chief Whitehead in his official capacity as the Chief of the LPD.  Even if the department were specifically named, a municipal police department is not a proper

---

[4] Here, Defendants place considerable emphasis on the taser records to bolster their version of events.  However, the records, while perhaps persuasive, are not conclusive, and do not overcome the admissible evidence submitted by Plaintiffs.  The Court does not find the taser download records to be uncontroverted evidence as to the duration of J.R.'s tasing or the officer(s) who tased him.  These records stand in contrast to the undisputed video evidence in *Scott v. Harris*, 550 U.S. 372, 386 (2007), which directly contradicted the defendant's claim that the pursuing officer's defensive move during a high speed chase was unreasonable and allowed the Court to grant summary judgment on the grounds of qualified immunity.

party against which municipal liability may be alleged. *See Sow v. Fortville Police Dept.*, 636 F.3d 293, 300 (7th Cir. 2011) ("The Indiana statutory scheme does not grant municipal police departments the capacity to sue or be sued."). The proper party for municipal liability would be the City of Lawrence, and Plaintiffs have not sued the City.[5]

Finally, even if Plaintiffs had properly named the City of Lawrence, their § 1983 claim for municipal liability would still fail. The United States Supreme Court has held that § 1983 claims may be properly brought against municipalities and other local governmental entities for actions by its employees only if those actions were taken pursuant to an unconstitutional policy or custom. *Monell*, 436 U.S. at 690. A successfully established *Monell* claim can fall under one of the following three categories:

(1) an express policy that, when enforced, causes a constitutional deprivation;
(2) a widespread practice that, although not authorized by written or express municipal policy, is so permanent and well-established as to constitute a "custom of usage" with the force of law; or
(3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Estate of Moreland v. Dieter*, 395 F.3d 747, 758-59 (7th Cir. 2004) (internal citations omitted). To be held liable for a custom or practice, the plaintiff must show that the government was "deliberately indifferent to the known or obvious consequences." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

In their Complaint, Plaintiffs claim that "a custom, policy or practice of LPD allowing, condoning, and encouraging the excessive, unnecessary, and inappropriate use of tasers" resulted in the deprivation of J.R.'s rights. [Dkt. 1 at 5.] As Defendants correctly point out, however, Ms. Reed-Hayes and J.R. have offered no admissible evidence in response to Defendants'

---

[5] As will be discussed later, it is too late for Plaintiffs to name the City of Lawrence, and they have not sought leave to do so.

motion that would support the inference that LPD had a widespread custom or practice of encouraging or condoning excessive force. Indeed, their response brief is devoid of any argument or designation of evidence regarding any such custom or practice. [*See generally* dkt. 43.] Instead, Plaintiffs argue that Chief Whitehead "turned a blind eye," [dkt. 43 at 11], to the officers' conduct by accepting an allegedly inaccurate report of the tasing incident, [*id*. at 12-13], but they do not offer evidence to support the inference that the alleged improper acceptance of the Officers' version of events is part of any pattern of custom or practice, rather than an isolated incident. Finally, the Chief's alleged misconduct occurred after the incident complained of, and thus could not have contributed to Plaintiffs' alleged injuries, given the lack of evidence supporting a widespread practice.

It is the Plaintiffs' burden to offer admissible evidence in support of the claim in order to defeat Defendants' motion for summary judgment. *Celotex*, 477 U.S. at 324. Because Plaintiffs have failed to file suit against a proper party for municipal liability, and have furthermore failed to offer evidence to support a *Monell* claim, the Court grants Defendants' summary judgment motion with respect to Count II.

### B. Plaintiffs' State-Law Claims (Counts III, V-VII)

#### 1. The Indiana Tort Claims Act

Defendants also seek summary judgment on Plaintiffs' state law claims of battery, IIED, and negligent supervision. They argue that the IIED and negligent supervision claims are barred by the Indiana Tort Claims Act ("ITCA"), and that the officers did not commit battery against J.R. because "the officers' use of force was reasonable," [dkt. 33 at 29].

In their response brief, Plaintiffs concede that the ITCA precludes tort claims against the individual Defendants. [Dkt. 43 at 21.] *See* Ind. Code § 34-13-3-5(c). They argue, however,

that their state-law claims should nevertheless survive because "[their] failure to name the City of Lawrence...is an error that Plaintiffs can and will correct." [*Id*.]

As noted, the Plaintiffs allege state-law claims only against the individual officers. They have not named the City of Lawrence. While Plaintiffs now recognize that their erroneous manner of pleading subjects their claims to immunity under the ITCA, the time for Plaintiffs to amend their Complaint has long passed. [*See* dkt. 20, the parties' case management plan (setting August 11, 2011, as the deadline for joinder of new parties).] The Court also notes that, as of the date of this order, Plaintiffs have filed no motion for leave to join the City of Lawrence as an additional party. Further, the Seventh Circuit has repeatedly emphasized that amendment of a complaint cannot occur via a response to a summary judgment motion. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Therefore, Plaintiffs' state law claims cannot be salvaged through amendment, as they contend in their response brief, [dkt. 43 at 21].

The Court therefore grants summary judgment for Defendants with respect to Plaintiffs' claims of intentional infliction of emotional distress and negligent supervision, (Counts V, VI and VII). The Court will address J.R.'s battery claim separately.

### 2. J.R.'s Battery Claim Against the Officers (Count III)

J.R. alleges that the LPD officers' use of a taser against him constituted battery under Indiana law. [Dkt. 1 at 5-6.] The LPD officers argue that they are entitled to summary judgment on this claim because "[t]he officers' use of force was reasonable." [Dkt. 33 at 29.] The Court need not reach the Defendants' reasonableness argument, however, because Plaintiffs' failure to name the City of Lawrence as a defendant also dooms J.R.'s battery claim.

Under Indiana law, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *See Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (internal citations omitted). Indiana law also provides that an individual is justified in engaging in conduct otherwise prohibited if he has legal authority to do so. Ind. Code § 35-41-3-1. Therefore, to establish a battery claim against a governmental entity arising from a police officer effectuating an investigatory stop or arrest, a plaintiff must show that the officer used "unnecessary or excessive force." *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010).

Although, as the Indiana Supreme Court's holding in *Wilson* makes clear, governmental entities are not entitled to law enforcement immunity on claims of battery or excessive force, J.R. has not sued an entity here, but rather the officers as individuals. [*See* dkt. 1.] As Defendants correctly point out, "[t]here is no claim in the complaint alleging entity liability under state law for police battery, imputable to the city via *respondeat superior*." [Dkt. 46 at 11.]

Further, because Plaintiffs' Complaint sues the officers solely for conduct undertaken within the scope of their employment,[6] there can be no individual liability. Without including the City of Lawrence as a party, J.R.'s battery claim is not viable under Indiana law. Ind. Code § 34-13-3-5(c); *see also Wilson*, 929 N.E.2d at 204 (summarily affirming a grant of summary judgment to an individual officer sued for excessive force). Accordingly, the Court also grants summary judgment to Defendants on J.R.'s battery claim (Count III).

---

[6] *See* dkt. 1 at 5 ("The Officers' actions were taken under color of state law, in that, at the time of the actions, the Officers were sworn law enforcement officers with the LPD, were on duty and were exercising authority conferred upon them by the State of Indiana.").

## IV.
### CONCLUSION

Genuine disputes of material fact exist concerning the reasonableness of the force used by the officers. Those disputes preclude both a grant of summary judgment on J.R.'s § 1983 excessive force claim (Count I) and a finding of qualified immunity. As to all other claims, Defendants have demonstrated they are entitled to judgment as a matter of law. Therefore, the Court **GRANTS in part and DENIES in part** Defendants' Summary Judgment Motion. [Dkt. 32.] The case will proceed to trial on Count I only.

08/14/2012

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution by ECF only:**

Mark A. Holloway
STEPHENSON MOROW & SEMLER
mholloway@stephlaw.com

Jay Meisenhelder
EMPLOYMENT AND CIVIL RIGHTS LEGAL SERVICES
jaymeisenhelder@gmail.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com